JAMES B. GLENNON (SBN 303134)
DIANA R. LOTFI (252892)
THOMAS B. ORLANDO (*Pro hac vice*)
TRACEY A. JORDAN (*Pro hac vice*)

**FORAN GLENNON PALANDECH PONZI & RUDLOFF PC**
38 Corporate Park
Irvine, CA 92606
(949) 791-1060
(949) 791-1070 (Fax)
Emails: jglennon@fgppr.com
dlotfi@fgppr.com
torlando@fgppr.com
tjordan@fgppr.com

Attorneys for Plaintiffs WILLIAM SMITH, BRIAN CLOVER, SCOTT MCCULLOCH

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
ATTORNEYS AT LAW
38 CORPORATE PARK
IRVINE, CALIFORNIA 92606
(949) 791-1060

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| William Smith. Brian Clover, and Scott McCulloch,<br><br>Plaintiffs,<br><br>vs.<br><br>Abel M. Tesfaye (p/k/a The Weeknd); Jason Quenneville (p/k/a DaHeala); Ahmad Balshe (p/k/a Belly); Savan Harish Kotecha; Karl Martin Sandberg (p/k/a Max Martin); The Weeknd XO, LLC; The Weeknd XO, Inc.; DaHeala & Co., LLC; MXM, LLC; MXM Publishing; MXM Music AB; Wolf Cousins; Universal Music Group, Inc.; Universal Music Publishing, Inc. Universal Music Corporation; Kobalt Songs Music Publishing, Inc.; SONGS Music Publishing LLC; Songs of SMP; Warner/Chappell Music, Inc.; WB Music Corp.; Sal and CO Management LP; Sal and CO LP; Wassim Salibi (aka Tony Sal)(general partner of Sal and Co); Artist Nation Management Group, Inc. (general partner of Sal and Co);The Weeknd XO Music, ULC | **Case No. 2-19-cv-02507-PA-MRW**<br><br>**DECLARATION OF DR. ALEXANDER STEWART IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
ATTORNEYS AT LAW
38 CORPORATE PARK
IRVINE, CALIFORNIA 92606
(949) 791-1060

XO&Co., Inc. (d/b/a XO); and UMG Recordings, Inc. (d/b/a Republic Records);

Defendants.

## DECLARATION OF DR. ALEXANDER STEWART

I, Dr. Alexander Stewart, declare and state:

1. I am over the age of 18 and have personal knowledge of the following facts and could competently testify to these facts if called upon to do so.

2. I was initially retained in this matter by Attorney AJ Fluehr of Francis Alexander, 280 N. Providence Road, Suite 1, Media, PA. Attorney Fluehr was counsel for the Plaintiffs William Smith, Brian Clover, and Scott McCulloch. As part of that retention, I prepared my Preliminary Report, which is dated January 8, 2019. A true and correct copy of my Preliminary Report is attached herein as Exhibit 15 to this Declaration, and if called to testify, I can and will testify consistently thereto.

3. On or about May 15, 2020, I received a subpoena for my deposition from Attorney Peter Anderson, counsel for the Defendants in this case, requiring my deposition. A true and accurate copy of the subpoena is attached herein as Exhibit 16. The deposition took place on May 27, 2020. During the deposition, Plaintiffs did not participate in that deposition. In addition, there was no attorney present for the Plaintiffs during the deposition.

4. In June 2020, I was contacted by Attorney Diana Lotfi of Foran Glennon Palandech Ponzi & Rudloff PC ("Foran Glennon") and asked if I would consider being re-retained in this matter. Although I was initially hesitant about being retained given that I was required to give a deposition without the assistance and participation of counsel on behalf of Plaintiffs, I eventually agreed to be retained by Ms. Lotfi and the Foran Glennon firm on behalf of Plaintiffs.

5. As a result of my analysis in this case, I prepared the attached Rebuttal Report. Prior to the retention by the Foran Glennon firm, I was not asked to review the reports of Dr. Lawrence Ferrara or given an opportunity to update my Preliminary Report. A true and accurate copy of my Rebuttal Report is attached herein as Exhibit 17 to this Declaration, and if called to testify, I can and will testify consistently thereto.

6. As reflected in my Preliminary Report, as stated during my deposition, and as reflected in my Rebuttal Report, it is my opinion that *A Lonely Night* very likely resulted from copying *I Need to Love*.

7. I believe that the preponderance of the musicological evidence presented by the experts in this case points strongly toward copying. The literal similarity of the melodies in pitch sequence, melodic contour, intervals, phrasing, rhythms, and metric placement as well as the nearly identical selection and arrangement of harmonies and other elements amount to substantial similarities that in my opinion indicate copying. This expression is the most valuable content in both songs both from a quantitative and qualitative perspective. The material from *I Need To Love* forms the entire chorus or hook of *A Lonely Night* – its most memorable part.

8. The literal similarity of the melodies in pitch sequence, melodic contour, intervals, phrasing, rhythms, and metric placement as well as the nearly identical selection and arrangement of harmonies and other elements indicates copying.

9. For my methodology, I looked at both works as a whole with regard to such elements as tempo, key, modality (for example, major or minor), structure, and lyrical content. I then transcribed any portions of music that reveal similarities in melodic, harmonic and rhythmic expression and carefully considered both protectable expression and elements that in isolation might be considered unprotectable.

10. I also considered prior art.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
ATTORNEYS AT LAW
38 CORPORATE PARK
IRVINE, CALIFORNIA 92606
(949) 791-1060

11. I considered whether *Heart of Glass* is similar to either *I Need to Love* or *A Lonely Night*. There are obvious dissimilarities between *Heart of Glass* and both *I Need to Love* and *A Lonely Night*. These differences can be found in the modes, the harmonies and harmonic movement, and the most important pitches and intervals. Specifically, *Heart of Glass* is in major mode and the two songs at issue in this case are in minor mode. Also, the functional harmonic movement underlying the melody in *Heart of Glass* is opposite of the movement used in *I Need to Love* and *A Lonely Night*. Therefore, the melody and its harmonization in *Heart of Glass* are different. The patterns reflected in the melodies with intervals between pitches further demonstrates differences that distinguishes any prior art. Moreover, even if I accept as true Dr. Ferrara's conclusion that only three notes of protectable elements remain after considering prior art, those "three notes" are among the most important in these melodies and demonstrate the significant differences between *Heart of Glass* to both *I Need to Love* and *A Lonely Night.*

12. I do not agree with the methodology used by Dr. Ferrara. Dr. Ferrara omitted harmonies and chord symbols thereby eliminating the harmonic context. Dr. Ferrara's reductionist methodology renders almost all creative expression unprotectable as fragmentary melodic segments could be used to subtract pitches from melodies, and contextual elements such as harmonies are erased as if they didn't affect the listener's perception of the melody. Notes exist only as part of a larger melody, and the melody that is similar between *I Need to Love* and *A Lonely Night*, along with the alteration of key notes and their nearly identical supporting harmonies are unique to *I Need to Love* and *A Lonely Night*.

13. As reflected in my Rebuttal Report and as noted during my deposition, I do not find either *The World Is Not Enough* or the X-Men theme song to be similar to *I Need to Love*. In fact, both of those songs are each much less similar to *I Need to Love* and *A Lonely Night* as *I Need to Love* and *A Lonely Night* are to each other.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
ATTORNEYS AT LAW
38 CORPORATE PARK
IRVINE, CALIFORNIA 92606
(949) 791-1060

14. With regard to *I Need to Love* and *A Lonely Night*, the placement of both *I Need to Love* and *A Lonely Night* in minor mode with the placement of the melodies in different modes is evidence of identical selection and arrangement of the musical materials.

15. The harmonization of the melody of *I Need to Love* and *A Lonely Night* demonstrates that while movement from tonic to subdominant is not protectable in and of itself, the creative choice in both songs makes the selection and arrangement of melody protectable.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: June 29, 2020

**DR. ALEXANDER STEWART**

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
ATTORNEYS AT LAW
38 CORPORATE PARK
IRVINE, CALIFORNIA 92606
(949) 791-1060

Exhibit 15

**Alexander Stewart, Ph.D. LLC**
**Musicology Report**

**January 8, 2019**

**Re: "I Need To Love" and "A Lonely Night"**

1. I am Professor of Music, Jazz Studies Coordinator, and former Director of Latin American and Caribbean Studies at the University of Vermont. I helped design and implement the Music Technology and Business Program. I have contributed to numerous peer-reviewed journals and other publications and I am author of a book, *Making the Scene: Contemporary New York City Big Band Jazz*, published by University of California Press (2007). My article on drumming and rhythms, "Funky Drummer," first published in the British journal *Popular Music* in 2000, has been reprinted in several anthologies and has been widely cited. My scholarly work encompasses extensive music transcriptions, musicological analysis, historical research, and other activities, particularly in popular music. I earned a Ph.D. in Music (Ethnomusicology Concentration) from the Graduate Center of the City University of New York (CUNY) and a Master of Music in Jazz and Commercial Music from Manhattan School of Music. During 2006-7 I was a Fulbright scholar researching traditional and popular music in Mexico. As an active professional musician for more than forty years I have performed and recorded with leading musicians in jazz and popular music such as Lionel Hampton, Wynton Marsalis, and Ray Charles. I have provided expert opinions and analysis and lectured widely on music copyright matters for over fifteen years.

2. I have been asked to compare "I Need To Love" and "A Lonely Night." I was provided mp3 audio files of these two songs by Francis Malofiy of Francis Alexander, LLC. I downloaded the sheet music of "A Lonely Night" from musicnotes.com. I transcribed relevant portions from both recordings, which, along with the sheet music, are contained in or attached to this report.

3. My preliminary investigation and analysis has revealed substantial similarities between these two songs. Subjectively, I believe these similarities are so clear as to be obvious even to a casual listener. As seen in my objective analysis below, these similarities amount to, both quantitatively and qualitatively, the most important musical expression in both works. In my opinion, based on the level of detail in which these similarities are found, these similarities could only result from copying.

4. General Characteristics

| | Tempo | Key |
|---|---|---|
| NL | ~120 bpm[1] | F# minor |
| LN | 114 bpm | G minor |

Both songs are set to a minor mode. F# minor and G minor are one half-step apart from each other, as close as two keys can be in the Western tonal system.

The tempos of each song differ slightly. LN is only six beats per minute slower, a difference of about 5%. For ease of comparison, following standard musicological procedure, the chords have been transposed to the same key, G minor.

5. Harmony

| | | | | | | |
|---|---|---|---|---|---|---|
| NL | F#min7 | Bmin7 | | E | E7 | F#min7 |
| NL (transposed) | **Gmin7** | **Cmin7** | | F | F7 | Gmin7 |
| LN | **Gmin7** | **Ebmaj7** | Dmin7 | | | |

The passages at issue in this matter (as discussed further below) are set to the first two chords, G minor seventh to C minor in "Need to Love" and G minor seventh to E-flat major seventh in "Lonely Night."

| | | |
|---|---|---|
| NL (transposed) | Gmin7 | Cmin7 |
| LN | Gmin7 | Ebmaj7 |

As can be seen, only the second chord is different. But C minor and E-flat major are two closely related chords. Indeed, in basic music theory, E-flat major is considered the relative major of C minor and the two keys have the same key signature. The two chords share most of the same pitches as given below:

| Chord name[2] | Pitches |
|---|---|
| C minor 7 | C **Eb G Bb** |
| Eb major 7 | **Eb G Bb** D |




---

[1] bpm = beats per minute

[2] Chord symbols for minor include a dash (C-7), a lower case "m" (Cm7), and the letters "min" (Cmin7). Major chords are indicated with an upper case "M" (CM7) or the letters "maj" (Cmaj7).

The seventh chords contain three of their four pitches in common. The main difference is the bottom pitch or root of each chord. In practice, these two chords are often interchangeable. As a result, the passages at issue in this matter are set to almost identical harmonies.

6. Signature passage or "hook" of each song

The most important musical expression in both songs consists of virtually identical musical passages. Example 1 below provides a transcription of the first full iteration of these parts in each song. As will be demonstrated in my analysis below, quantitatively and qualitatively these passages form the "hooks" or most valuable content of each song. As with the harmonies, for comparison purposes the passages have been transposed to the same key, G minor.

Example 1 Signature phrases: "Need To Love" (transposed to G minor) and "Lonely Night"




All the notes in common have been highlighted in red. Besides sharing almost all the same pitches (discussed further below under pitch sequence), the melodies in each song consist of two phrase parts, a shorter figure on the first four syllables that functions as an antecedent phrase segment and a longer figure containing the next eleven syllables that functions as a consequent or answering phrase segment. These phrase segments are separated by a quarter-rest (one-beat rest) and set to almost exactly the same pitch sequences, rhythms, metric placement, and harmony.

| | Antecedent figure | Consequent figure |
|---|---|---|
| NL | It's clear to me | get that fun-ny feel-ing when you're next to me |
| LN | A lone-ly night | ba-by girl I loved you on a lone-ly night (oh) |

Pitch sequence

An important way of comparing melodies is by pitch sequence. To facilitate comparison I have converted each pitch of the natural G minor scale to an integer from one to seven as follows:

1 = G
2 = A
3 = B-flat
4 = C
5 = D
6 = E-flat
7 = F

The sequences of the first fifteen pitches in the melodies in Example 1 can thus be represented as:

NL 5215 21212321216
LN 3255 21212321266

In the above sequence, all but three of the fifteen pitches (80%) of the melodic hook of NL have been copied in the melodic hook of LN. The rhythmic gestures are also nearly identical. The shorter first phrase of four syllables in each song begins with a pick up eighth note leading to the downbeat of the next measure. This note leads to two quicker notes on the last two syllables, the last of which anticipates the third beat. The second, longer phrase begins on beat one of the next measure with syncopated sixteenth notes on the 2nd and 1st scale degrees (A and G) before moving up to a longer note on the 3rd degree of the scale (B flat) and returning on beat four to eighth notes set to the 2nd and 1st scale degrees. A longer note on the first beat of the next measure on the second scale degree precedes the move to the flatted sixth (E-flat), which, as in the antecedent phrase, anticipates the third beat. As mentioned earlier, in both songs, these melodies are set to almost identical harmony. One small difference is the added "oh" at the end of the Lonely Night phrase which is not found in NL.

Example 2. Signature phrases: "Need To Love" (transposed to G minor) and "Lonely Night"




NL 215 21212321216
LN 3255 21212321266 (75)

In the above sequences, all but two of the pitches out of fourteen (86%) in NL have been copied in LN. Most of the analysis of the rhythmic and metric phrasing in Example 1 applies here also. As can be seen, the rhythmic setting of the first eleven syllables of the second phrase is even closer – the sixteenth-note syncopation matches almost exactly in the third measure.

Example 3. Signature phrases: "Need To Love" (transposed to G minor) and "Lonely Night"




NL **5215 121212321216**
LN 5**53215 121212321266** (75)

In the above sequences in Example 3 all but one pitch out of sixteen (94%) in NL has been copied in LN. One difference in this example is the three-note pick up to the first phrase in LN. But even this detail can be found in LN as can be seen in Example 4.

<u>Antecedent figures</u>
The first shorter or antecedent figure also plays a prominent role in NL where it is coupled with a shorter version of second phrase. Example 4 illustrates the similar three-note pickups this phrase contains in common with the second iteration of the Lonely Night phrase at 0:58.

Example 4. Antecedent figures in "Need To Love" and "Lonely Night"




**513215**
**553215**

Once again, the pitch sequences are almost identical.

One final detail further confirms copying. In both songs the antecedent phrase is followed by an imitative phrase that provides a melodic echo. In NL this musical effect occurs at the beginning of the work (and elsewhere) and the same device can be heard at 2:48 in LN.

Example 5. Melodic "echoes" in "Need To Love" and "Lonely Night"




7. Quantitative significance

The passages discussed above appear numerous times throughout both works. In NL, in addition to the complete phrases, the antecedent figure and the ending of the consequent figure (the last four syllables) appear by themselves. In musicological terms, a salient thematic element (a "motif" in the visual arts or in literature) is called a "motive." For the sake of musical analysis, motives are often assigned a letter and closely related motives containing slight variations are given the same letter followed by a superscript number. Because these phrases are closely related, differing only in their lowest and final pitch I have labeled them Motive A and Motive $A^1$. In example 6 Motive A is circled in green and Motive $A^1$ in blue.

Example 6 Motive A and Motive $A^1$



In the following chart these appearances are labeled accordingly. "Complete" iterations include the full antecedent and consequent figures. All times are approximate within one second.

"Need To Love"
0:01-0:09 motives $AA^1$
0:18-0:25 complete
0:34-0:41 complete
0:49-0:56 motives $AA^1$
1:06-1:13 complete
1:22-1:29 complete
1:37-1:45 motives $AA^1$
1:53-2:00 motives $AA^1$
2:09-2:16 motives $AA^1$ instrumental variation
2:38-2:45 motives $AA^1$
2:53-3:00 motives $AA^1$with vocal embellishment
3:09-3:16 motives $AA^1$with vocal embellishment
3:24-3:31 motives $AA^1$with vocal embellishment
3:41-3:48 motives $AA^1$

"A Lonely Night"
0:50-0:58 complete
0:58-1:06 complete
1:40-1:48 complete
1:48-1:56 complete
1:58-2:00 instrumental (motive A)
2:40-2:48 complete
2:48-2:56 complete
2:56-3:05 complete
3:05-3:13 complete
3:15-3:18 (partial)

As can be seen above, the passages at issue occur 14 times in NL (including four complete iterations) and 10 times in LN (including eight full iterations). In NL this musical content comprises 1:39 minutes of the 3:58 song, or 42%. In LN the expression constitutes 1:10 of the 3:40 song, or 32%.

| | # of iterations | Time |
|---|---|---|
| NL | 14 iterations | 1:39 of 3:58 or 42% |
| LN | 10 iterations | 1:10 of 3:40 or 32% |

8. Qualitative significance

My quantitative analysis is based on the durations of the various passages in relation to the overall songs. Following standard musicological procedures, these quantitative measurements should be adjusted according to the qualitative significance of the musical expression at issue.

In both songs, the passages at issue form the core of each work and their significance is augmented by their structural location and function. Besides appearing throughout the entire work, in "Need To Love" the passages appear at the very beginning of the song and are repeated numerous times at the end. They make not only the initial impression upon the listener but also leave a lasting impression as the final sounds the listener hears. Their phrasing, melodic contour, and rhythmic setting make them the most musically interesting elements of the entire work. While not heard at the beginning of "Lonely Night," these passages form the chorus or hook of LN. The chorus of LN is based almost entirely on this musical expression and the lyrics containing the song's title are first heard during this section. In fact, the words "a lonely night" in the phrase "**A lonely night**, baby girl I loved you on **a lonely night**" are set to the Motives A and $A^1$ discussed above, in effect the song's title words forming bookends on the musical expression at issue. As in NL, these passages also form the "outro" or ending of LN where they are heard five times in the final minute of the song.

The passages discussed above are the most important and memorable musical expression in both songs. Composers and producers in popular music consider that, in order to be successful, songs must contain at least one or more of these memorable passages or "hooks." These passages are unquestionably the "hooks" or most valuable expression in each song.

9. In this investigation and analysis I have found substantial similarities that in my opinion can only be the result of copying. These similarities include melodic, harmonic, rhythmic, and foundational musical expression more generally as well as important details. This expression is the most valuable content in both songs both from a quantitative and qualitative perspective.

10. As a preliminary inquiry, this report is not intended to be exhaustive and I retain the right to amend or supplement it should further information become available.

Respectfully submitted,

Alexander Stewart, Ph.D. LLC

# Need to Love


0:02
= 120
synth
Vocals
G-7 C-7
Da da da da da_ da Da da da da da_ da_______ Oh
6
F F7 G-7 C-7 D
0:18
G-7
I,_______ oh I,____ I need to love._______ It's clear to me_
11
C-7 F
get that fun-ny feel-ing when you're next to me_ and I can see it in_your eyes
15
F7 G-7
0:34
G-7
There's no sac-ri-fice_ 'cause you're hold - ing me_______ Tell - ing me_
19
C-7
3
Tell me what you're think-ing when you're hold - in' me__ And I
22
F F7 G-7 C-7 D
3
want you to see how much you mean to me_ for et - ern - i-ty.____ Da da da

*From: "The Weeknd - Starboy"*

# A Lonely Night

by

ABEL TESFAYE, MAX MARTIN,
SAVAN KOTECHA, AHMAD BALSHE,
ALI PAYAMI, JASON QUENNEVILLE
and ANDERS SVENSSON

Published Under License From

Kobalt Music Publishing America, Inc.

Copyright © 2016 Songs Music Publishing, LLC o/b/o Songs Of SMP, MXM, WB Music Corp.,
Wolf Cousins, Warner/Chappell Music Scandinavia AB, Universal Music Corp. and Sal And Co LP
All Rights for MXM Administered Worldwide by Kobalt Songs Music Publishing
All Rights for Wolf Cousins and Warner/Chappell Music Scandinavia AB in the U.S. and Canada Administered by WB Music Corp.
All Rights for Sal And Co LP Administered by WB Music Corp. and Universal Music Corp.
All Rights Reserved Used by Permission

Authorized for use by ***Alexander Stewart***

NOTICE: Purchasers of this musical file are entitled to use it for their personal enjoyment and musical fulfillment. However, any duplication, adaptation, arranging and/or transmission of this copyrighted music requires the written consent of the copyright owner(s) and of Kobalt Music Publishing America, Inc.. Unauthorized uses are infringements of the copyright laws of the United States and other countries and may subject the user to civil and/or criminal penalties.

musicnotes.com

**Exhibit 15**

# A LONELY NIGHT

Words and Music by ABEL TESFAYE,
ANDERS SVENSSON, MAX MARTIN,
SAVAN KOTECHA, AHMAD BALSHE,
ALI PAYAMI and JASON QUENNEVILLE




Copyright © 2016 Songs Music Publishing, LLC o/b/o Songs Of SMP, MXM, WB Music Corp.,
Wolf Cousins, Warner/Chappell Music Scandinavia AB, Universal Music Corp. and Sal And Co LP
All Rights for MXM Administered Worldwide by Kobalt Songs Music Publishing
All Rights for Wolf Cousins and Warner/Chappell Music Scandinavia AB in the U.S. and Canada Administered by WB Music Corp.
All Rights for Sal And Co LP Administered by WB Music Corp. and Universal Music Corp.
All Rights Reserved Used by Permission



musicnotes.com
Authorized for use by: *Alexander Stewart*




Exhibit 15

164



Authorized for use by: *Alexander Stewart*






musicnotes.com

Authorized for use by: ***Alexander Stewart***






musicnotes.com
Authorized for use by: *Alexander Stewart*




**Exhibit 15**

**167**



Authorized for use by: ***Alexander Stewart***




Exhibit 15
168



Authorized for use by: *Alexander Stewart*






musicnotes.com
Authorized for use by: ***Alexander Stewart***

Exhibit 16

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

WILLIAM SMITH, et al.,
*Plaintiff*
v.
ABEL M. TESFAYE, etc., et al.,
*Defendant*

Civil Action No. 2:19-cv-02507-PA-MRW

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: DR. ALEXANDER STEWART

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Pursuant to Court Order, the deposition will be taken by video. Please see attached Attachment No. 1. | Date and Time: 05/27/2020 9:30 am |
|---|---|

The deposition will be recorded by this method: Please see the attached Attachment No. 1 to this Subpoena.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Please see the attached Attachment No. 2 to this Subpoena.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 05/11/2020

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* defendants Abel M. Tesfaye, et al., , who issues or requests this subpoena, are:
Peter Anderson, Esq., Davis Wright Tremaine LLP, 865 S. Figueroa St., 24th Floor, Los Angeles, CA 90017-2566; e-mail: peteranderson@dwt.com; tel: (213) 633-6800

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**Exhibit 16**

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Exhibit 16**

**ATTACHMENT NO. 1**

**TO SUBPOENA**

The deposition will be recorded by this method: by certified shorthand reporter, and by video recording, and, pursuant to the Court's April 9, 2020, Order, the deposition shall be conducted by video. Prior to the commencement of the deposition, all participants will be provided an Internet link to connect remotely.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///



Exhibit 16

**ATTACHMENT NO. 2**

**TO SUBPOENA**

**Instructions and Definitions**

1. "**You**" and "**your**" mean Dr. Alexander Stewart.

2. "**Documents**" and "**document**" include but are not limited to all "writings," "recordings" and "photographs," as those words are defined in Rule 1001 of the Federal Rules of Evidence and all means by which information, images or sounds can be communicated, stored or recorded, and include without limitation, letters and other written correspondence, e-mails, text messages, notes (whether handwritten or otherwise), memoranda, electronically stored information (even if not previously printed), post-its, buck slips, receipts, contracts, letter agreements, drafts and other writings by which letters, words or numbers, or their equivalent, are set down or stored by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording or other form of data compilation, audio recordings, video recordings and photographs.

3. **You** are required to produce all of the following **documents** within **your** possession, custody or control, whether or not authored by **you**.

4. If **you** withhold any **documents** on the grounds of privilege or otherwise, **you** are required to expressly state the basis for withholding the **documents** and describe in writing the nature of the withheld **documents** in a manner sufficient to enable the parties to assess the basis for withholding the **documents**.

5. Electronically-stored information is to be produced **either**:

(a) in the form of printouts; or

(b) on a CD, DVD or thumb drive and in a form accessible by defendants' counsel.

6. **You** are required to produce the original of each of the following documents; if the original of a document is not in your possession, custody or control or otherwise available to you, then you are required to produce any exact copy of the

original which is in your possession, custody or control or otherwise available to you. In addition to the foregoing, you are also required to produce every copy of each of the following documents which is not identical to the original (*e.g.*, a copy which bears handwritten or other notations, date stamps, received stamps, "bcc" notations, facsimile transfer notations or other marks not appearing on the original).

7. **"Your Report"** means your Musicology Report dated January 8, 2019, and labeled "Re: 'I Need To Love' and 'A Lonely Night,'" including its attached transcription labeled "Need to Love" and published sheet music labeled "A Lonely Night."

8. **"I Need to Love"** means the musical composition and/or sound recording titled *I Need To Love* and which is referenced in **your Report**.

9. **"A Lonely Night"** means the musical composition and/or sound recording titled *A Lonely Night* and which is referenced in **your Report**.

10. The "**Lawsuit**" means the lawsuit brought by William Smith, Brian Clover, and Scott McCulloch, and pending in the United States District Court, Central District of California, Case No. 2:19-cv-02507-PA-MRWx.

11. **"Your reports"** refers to any and all reports and summaries of conclusions that you prepared or signed relating to the **Lawsuit**, **I Need To Love**, and/or **A Lonely Night**, including but not limited to **your Report**.

## DOCUMENTS TO BE PRODUCED

1. All correspondence, e-mails, notes, memoranda and other **documents** to, from or exchanged with William Smith, Brian Clover, and Scott McCulloch, Francis Malofiy, Alfred ("AJ") Fluehr, Glen L. Kulik, and/or David A. Bernardoni, that mention or relate to:

(a) Compensation for **your** analysis, study, or testimony in connection with **your Report** and/or the **Lawsuit**;

(b) Facts or data provided to **you** and that **you** considered in forming the opinions, or any of them, in **your reports** and/or the

**Lawsuit**, or in forming opinions, or any of them, otherwise to be expressed by **you** in connection with the **Lawsuit**;

(c) Facts or data provided to **you** and that **you** did not consider in forming the opinions, or any of them, in **your reports** and/or the **Lawsuit**, or in forming opinions, or any of them, otherwise to be expressed by **you** in connection with the **Lawsuit**;

(d) Assumptions that were provided to **you** or which **you** were asked to assume and which **you** relied or rely upon, in whole or part, in forming the opinions, or any of them, in **your reports** and/or the **Lawsuit**, or in forming opinions, or any of them, otherwise to be expressed by **you** in connection with the **Lawsuit**.

2. All retainer agreements, contracts, letter agreements, notes, e-mails, memoranda, invoices, checks, receipts, wire transfer documents and other **documents** that mention, reflect or relate to **your** retention or services as a witness in the **Lawsuit**.

3. All musical transcriptions, charts, notes, work papers and other **documents** created by **you** or anyone else in the course of the preparation of **your reports**.

4. All audio recordings of **I Need To Love**, or any portion thereof, provided to **you**, created by **you** or otherwise in **your** possession, custody or control.

5. All audio recordings of **A Lonely Night**, or any portion thereof, provided to **you**, created by **you** or otherwise in **your** possession, custody or control.

6. Audio recordings, lists, notes, transcriptions, sheet music, or other **documents** sufficient to identify any and all examples of prior art that you identified, located, and/or considered in connection with the **Lawsuit**, **your Report**, and/or your analyses of **I Need To Love** and/or **A Lonely Night**.

7. Unless produced in response to a category above, all notes, recordings, musical transcriptions, comparisons, summaries, work product, and other **documents** prepared, utilized or considered by you in forming the opinions, or any of them, you

previously held or presently hold with respect to **I Need To Love** and/or **A Lonely Night**, including but not limited to opinions reflected or referred to in **your reports** or any of them.

8. All notes, recordings, transcriptions, comparisons, summaries, work product and other **documents** that mention, reflect or relate to any research, search or searches provided to **you**, or conducted by **you**, at **your** direction or on **your** behalf, in formulating the opinions, or any of them, you previously held or presently hold with respect to **I Need To Love** and/or **A Lonely Night**, including but not limited to opinions reflected or referred to in **your reports**.

9. All of **your** expert reports prepared in the preceding four years.

10. All transcripts of any testimony given by **you**, whether by deposition, trial or otherwise, in any litigation or arbitration in the past four years.

11. All drafts, outlines and preliminary versions of **your reports**.

12. All correspondence, e-mails, notes, memoranda and other **documents** that mention or relate to **your reports** or any of them.

13. All correspondence, e-mails, notes, memoranda and other **documents** that mention or relate to you serving as an expert witness in connection with the **Lawsuit**.

///

///

///

///

///

///

///

///

///

///

Exhibit 17

**Alexander Stewart, Ph.D. LLC**
**Musicology Report**

**June 29, 2020**

**Re: "I Need To Love" and "A Lonely Night"**

1. I am Professor of Music, Jazz Studies Coordinator, and former Director of Latin American and Caribbean Studies at the University of Vermont. I helped design and implement the Music Technology and Business Program. I have contributed to numerous peer-reviewed journals and other publications and I am author of a book, *Making the Scene: Contemporary New York City Big Band Jazz*, published by University of California Press (2007). My article on drumming and rhythms, "Funky Drummer," first published in the British journal *Popular Music* in 2000, has been reprinted in several anthologies and has been widely cited. My scholarly work encompasses extensive music transcriptions, musicological analysis, historical research, and other activities, particularly in popular music. I earned a Ph.D. in Music (Ethnomusicology Concentration) from the Graduate Center of the City University of New York (CUNY) and a Master of Music in Jazz and Commercial Music from Manhattan School of Music. During 2006-7 I was a Fulbright scholar researching traditional and popular music in Mexico. As an active professional musician for more than forty years I have performed and recorded with leading musicians in jazz and popular music such as Lionel Hampton, Wynton Marsalis, and Ray Charles. I have provided expert opinions and analysis and lectured widely on music copyright matters for eighteen years.

2. I have been asked to prepare a rebuttal to the Ferrara reports dated April 5 and 25, 2020. This rebuttal will also serve to update my original preliminary report dated January 8, 2019. For this current report I relied on audio files marked as Audio Exhibits 1-9 including the recordings of "I Need To Love" (henceforth NL) and "A Lonely Night" (henceforth LN) as well as sheet music of "Heart of Glass" (HG), "The World Is Not Enough," and "X-Men Theme" downloaded from musicnotes.com by Dr. Ferrara. I transcribed relevant portions from the recordings. I also conducted a search for prior art.

3. My current investigation and analysis have confirmed the substantial similarities I found in my earlier report. This similar expression consists of a signature phrase found in the verse of NL and the chorus or "hook" of LN. Subjectively, I believe these similarities are so clear as to be obvious even to a casual listener. As seen in my objective analysis below, these similarities amount to, both quantitatively and qualitatively, the most important musical expression in both works.

4. Methodology.
I begin by looking at both works as a whole as regards such elements as tempo, key, modality (for example, major or minor), structure, and lyrical content. Once this work is completed, I transcribe any portions of music that reveal similarities in melodic, harmonic and rhythmic

expression. I carefully consider both protectable expression and elements that in isolation might be considered unprotectable. Of course, any musical expression, if broken into small enough units (e.g., a few chords, words or melodic notes or a short rhythmic figure, etc.), could be considered a basic building block of music and therefore unprotectable by itself. Filtering out unprotectable elements must not be done blindly and requires keeping a sense of the overall musical expression and retaining the coherence of the musical expression. While prior art must be considered in such an analysis, a method that crudely subtracts notes found in other works without regard to their significance or their relationship to the overall expression does violence to the comparative process. Additionally, the creative selection and arrangement of elements that otherwise might be considered unprotectable, must be taken into account in any substantial similarity analysis.

My initial report, because it was preliminary, did not include a search for pre-existing similar works or "prior art." In comparing, researching and analyzing two songs I always start with a test for similarity. Without significant similarity, it makes no sense to search for prior art. Indeed, one would be hard pressed to know where the focus should be in such a search without first knowing what expression is shared between the two works. Having found substantial similarity between NL and LN, I fully expected to prepare a final report including a prior art search as a next step. However, from the time I submitted my January 2019 report until April of this year I heard little or nothing about this case from the attorneys.

After reviewing Dr. Ferrara's reports and conducting my own prior art search, my opinion regarding the substantial similarity remains unchanged from the January 2019 report. Quantitatively and qualitatively, the expression held in common between these two works is the most significant musical content in each. Moreover, based on the level of detail in which these similarities are found, I conclude they very likely result from copying.

In his declaration dated May 28, 2020 Dr. Ferrara, recognizing that the two songs "share a melodic similarity," states that "it is not musicologically significant because any melodic similarity appears in widely distributed prior art that, in some instances and respects, is closer to I Need to Love or A Lonely Night then they are to each other" (Declaration p. 3). In fact, the analysis he presents proves the opposite, showing that NL and LN are more similar to each other than they are to any of the prior art he cites.

Furthermore, in trying to minimize the importance of the expression at issue, he seems to dismiss it as only three bars out of much larger compositions (e.g., Declaration p.4). He fails to discuss the qualitative value of this expression both to NL, where it forms the most memorable part of the verse and related figurations appear in the chorus, and in LN, where **it forms the entire chorus or "hook"** including the title phrase: "**A lonely night**, baby girl I loved you on **a lonely night**, oh."

Finally, his emphasis on "dissection," with its biological connotations, not only betrays a pseudo-scientific approach but is used in a way that prioritizes the separation or surgical removal of vital parts. If we continue the biological analogy further than he does in his musical analysis, we can see that in biology, the goal of dissection is not only the removal or isolation of organs, but

involves understanding how they work together as parts of a system.[1] In much the same way, music is a complex form of human communication in which different elements combine and interact to form a distinctive aural experience. The pitches in NL that are different (though only three) are important enough and make the melody distinctive enough to argue substantial similarity of the melodies in NL and LN "standing alone." These pitches create very different intervals (the distance between two pitches) and establish the mode as minor rather than major (discussed in much more detail below). Moreover, the selection and arrangement of the underlying harmonies of these melodies reflect the same creative choices in both NL and LN and these are very different in HG (also discussed below).

Before offering my rebuttal, I will review the general characteristics of each work.

5. General Characteristics

| | Tempo | Key |
|---|---|---|
| NL | ~120 bpm[2] | F# minor |
| LN | 114 bpm | G minor |

Both songs are set to a minor mode. F# minor and G minor are one half-step apart from each other, as close as two keys can be in the Western tonal system.

The tempos of each song differ slightly. LN is only six beats per minute slower, a difference of about 5%.

Since the texts of each song have little in common, lyrical content is not at issue in the case.

6. Form/Structure

While my musicological reports typically contain formal or structural analysis, because my initial report was preliminary it did not provide a "road map" of each song in its entirety. While Dr. Ferrara insists that such analysis must be provided in every report, I believe it is common, particularly in preliminary reports, to reference the location of the expression at issue and discuss its qualitative significance in that regard. As this rebuttal is also providing an opportunity to address any uncompleted work in my preliminary report, I can acknowledge that I accept Dr. Ferrara's formal analysis of both songs with one exception: I disagree that the opening drum fill and melodic pick-ups of NL should be considered an "intro." I have never seen an approximately one-second portion of any musical work elevated to the status of being a "section." It is best described as a "pick-up measure."

One important structural element in both songs is the use of the same harmonic structure for both choruses and verses. More often than not, choruses are differentiated from verses and other sections, not only by a repeating lyrical refrain, but by different harmonies.

---

[1] See, for example, Kaitlyn Boettcher, " Why Do Students Dissect Frogs?" https://www.mentalfloss.com/authors/48743/Kaitlyn-Boettcher

[2] bpm = beats per minute

For ease of comparison, following standard musicological procedure, nearly all the music discussed below has been transposed to the same key, G minor. The one exception is "Heart of Glass" which, because it is in a major mode, has been transposed to G major.

7. Harmony

In the discussion of harmony in my preliminary report I described the chords as:

| | | | | | |
|---|---|---|---|---|---|
| NL | F#min7 | Bmin7 | E | E7 | F#min7 |
| NL (transposed) | **Gmin7** | **Cmin7** | F | F7 | Gmin7 |
| LN | **Gmin7** | **Ebmaj7** Dmin7 | | | |

Dr. Ferrara faults my harmonic analysis for omitting a final chord (V7 or D7 in the key of G minor) in NL. The progression outlined above accurately represents the first half of the verse. The final chord mentioned by Dr. Ferrara does not appear in the eight-measure section of NL beginning at 0:18 discussed in example 1. It does, however, appear at the end of the verse and chorus where it is preceded by a IV chord (C major).

Regardless, my analysis is concerned with the musical expression at issue in this case: the melodies and the underlying harmonies in my example 1. This expression is set to the two chords highlighted in red in each example that I discussed in the 2019 report.

> The passages at issue in this matter (as discussed further below) are set to the first two chords, G minor seventh to C minor in "Need to Love" and G minor seventh to E-flat major seventh in "Lonely Night."
>
> | | | |
> |---|---|---|
> | NL (transposed) | **Gmin7** | **Cmin7** |
> | LN | **Gmin7** | **Ebmaj7** |

I stand by my point that the second chords in the songs as described above, C minor and E-flat major, are two very closely related chords. Again, quoting from my January 2019 report:

> Indeed, in basic music theory, E-flat major is considered the relative major of C minor and the two keys have the same key signature. The two chords share most of the same pitches as given below:
>
> | Chord name[3] | Pitches |
> |---|---|
> | C minor 7 | C **Eb G Bb** |
> | Eb major 7 | **Eb G Bb** D |

[3] Chord symbols for minor include a dash (C-7), a lower case "m" (Cm7), and the letters "min" (Cmin7). Major chords are indicated with an upper case "M" (CM7) or the letters "maj" (Cmaj7).




The seventh chords contain three of their four pitches in common. The main difference is the bottom pitch or root of each chord. In practice, these two chords are often interchangeable. As a result, the passages at issue in this matter are set to almost identical harmonies.

Dr. Ferrara tries to score points by noting that any two chords a third apart will share many pitches. But that is precisely the point. That is why diatonic chords (with no altered pitches) with a root a third apart are often closely related. As will be seen below, the second chord in each progression (C minor 7 and Eb major 7) functions as a subdominant.

<u>8. Functional Harmonic Analysis</u>
Both songs are built on repeating harmonic structures. In NL the cycle is eight measures long and in LN the cycle is four measures.

The basic harmonic cycle of NL is:

| | | | | | |
|---|---|---|---|---|---|
| NL (transposed) | Gmin7 | Cmin7 | F | F7 | Gmin7 (Cmin D7) |

The basic harmonic cycle (repeated) of LN is:

| | | | | |
|---|---|---|---|---|
| LN | Gmin7 | Ebmaj7 Dmin7 Gmin7 | | Ebmaj7 Dmin7 |

In functional harmonic analysis, each chord is described according to three categories, taking into account its typical tendencies in moving to and from other chords as well as its behavior in a specific context. These three categories are: tonic (T), subdominant (S) (also referred to as predominant) and dominant (D). Originally developed around the turn of the last century for analysis of classical music, this procedure remains in widespread use today. In context, each of these three qualities exhibit differing levels of stability and instability. Tonic chords, because they embody the central tone or key note are the most stable. Subdominant chords portend a movement away from the tonic. Dominant chords are the least stable and create a tension that seeks resolution through a return to the tonic.

As part of this analysis, Roman numerals are assigned to the chords built on each scale degree with an uppercase letter denoting a major chord and lowercase indicating minor.

Figure 1




Because most of the chords in these two songs contain an additional pitch a third above the top pitch in the triads above in figure 1 (the seventh), the following analysis of the two songs simply adds an Arabic numeral 7 to each chord to indicate this additional pitch.

NL: i7 iv7 VII VII7 i7 (iv V7)<br>
LN (repeated): i7 VI7 v7 i7 VI7 v7

In terms of function, each progression could be described as embodying the basic movement TSDT (tonic-subdominant-dominant-tonic). (See the webpage from *Open Music Theory* linked below for a brief description of functional harmony in contemporary popular music.[4])

NL: T S D T S D (T)<br>
LN (repeated) T S D T S D (T)

The passages discussed below that comprise the most important and valuable expression in each song involve only the first two chords: in other words, the movement from tonic to subdominant. As will be seen, this analysis will also inform our analysis of prior art in important ways.

9. Signature passage or "hook" of each song

As I stated in my previous report, the most significant musical expression in both songs consists of virtually identical musical passages. Example 1 below provides a transcription of the first full iteration of these parts in each song. As was discussed in some detail in my earlier report, quantitatively and qualitatively these passages form the "hooks" or most valuable content of each song. As with the harmonies, for comparison purposes the passages have been transposed to the same key, G minor.

In his analysis of the harmonies and similar expression in the verse of NL and the chorus of LN, Dr. Ferrara recognizes that the first three measures contain musical similarities, but fails to acknowledge that the chorus of LN simply repeats this material. This omission is heightened when Dr. Ferrara compares these sections of each song in their entirety in order to show that they are constructed differently, but leaves out the most important point: that the chorus of LN is constructed entirely from the material allegedly taken from NL.

In the interest of economy, this report will focus on the first iterations of the expression at issue in this case. Because there are only slight variations between the various iterations in both songs,

---

[4] http://openmusictheory.com/popRockHarmony-minor.html

the analysis and the comparisons with prior art will remain applicable to these other iterations as well.

Example 1 Signature phrases: "Need To Love" (transposed to G minor) and "Lonely Night"




As discussed in my previous report, the pitches, rhythms, and metric placement of these melodies is nearly identical in every detail– a case of literal similarity. In the example above, I have rendered the second chord in each song in red to indicate that these are essentially the same chord – they share three of four pitches and they both function as subdominant harmony, the only difference being the root (C and E-flat). The move away from the stability of the tonic chord (G minor7) to the relative instability of the subdominant (i7 to iv or VI) is an important feature of this expression, both harmonically and melodically. In both songs, the measure immediately following the harmony moves to a dominant function chord: D minor7 (or v7) in LN and F7 (or VII7) in NL before resolving to the tonic. Like the subdominants iv7 and VI7, v7 and VII7 (D minor7 and F7) share three out of four pitches making them closely related. In contemporary popular music these are common "dominants" in minor keys. One small melodic difference between NL and LN is the tossed off "oh" that anticipates the D minor7 chord in the next measure.

<u>10. So-called "prior art"</u>

I will now address the three preexisting works discussed in Dr. Ferrara's reports. Of the three, because of its similarity to the two songs at issue in this case, Heart of Glass (HG) warrants the more detailed discussion. Because of its similar rhythmic placement and melodic contour HG also turned up in my prior art search.

<u>11. "Heart of Glass"</u>

I rejected HG as a valid example of similar prior art because of its obvious dissimilarities: 1) HG is in a major mode while both NL and LN are in minor modes, 2) the harmonies and harmonic movement are very different and 3) several of the most important pitches and intervals are different. My analysis below will show how this initial response was justified.

Example 2. HG, NL, and LN melodic comparison




Only nine of the first 15 notes (17 if the "oh" that anticipates the next measure's harmony is counted) of LN are found in HG while twelve are found in NL. Clearly, in terms of pitch content, LN is more similar to NL than HG is to either LN and NL. Dr. Ferrara's analysis confirms this in recognizing and isolating three pitches found in LN and NL that are heard in HG. But Dr. Ferrara's analysis falls short because it stops there. He completely disregards the importance of these notes by failing to look at them in context.

12. Harmonic context and modality

Perhaps nothing is more indicative of Dr. Ferrara's faulty methodology than his omission of harmonies and chord symbols in almost all his examples. Out of 39 music examples in his reports, only two (Examples 18 & 19 dealing with "The World Is Not Enough" on pp. 42 & 43 of his April 5 report) provide the chords along with the melody. While Dr.Ferrara typically separates and reduces musical elements into small enough units to dismiss them as "common building blocks," harmonic context is crucial to understanding how these melodies work. In music, melodies (horizontal or linear expression) interact in important ways with chords (vertical structures or simultaneities).

Major and minor modes

First, most Western music, especially in popular idioms is set to one of two modes: major or minor. The aural difference between these two modes is fundamental and is easily recognized by even musically untrained listeners. The placement of NL and LN in a minor mode is a clear creative choice that differentiates NL and LN from HG in a fundamental way. No one would make the absurd claim that the major or minor mode is protectable in and of itself, but placement of these melodies in different modes cannot be discounted or ignored and is evidence of identical selection and arrangement of musical materials.

Underpinning harmonies

In addition to the different modes, major and minor, the functional harmonic movement underlying the melody of HG is the *opposite* as that used in NL and LN. Like NL and LN the

passage at issue is supported by two chords. The chords of HG (depicted in blue above) are C **major** and G **major**, IV and I respectively. In minor keys both of these chords are minor (iv and i), but in major they are both major (as indicated by the uppercase Roman numerals). The movement in HG is therefore from the subdominant to the tonic – what is known as a plagal cadence.[5]

Example 3. HG, NL, and LN harmonies




HG Cmaj-Gmaj IV-I or **Subdominant-Tonic (S-T)**
NL Gmin7-Cmin7 i-iv or **Tonic-Subdominant (T-S)**
LN Gmin7-Ebmaj7 i-VI or **Tonic-Subdominant (T-S)**

The melody and its harmonization in HG therefore move from the relative instability of the subdominant to resolution on the tonic while the melodies and harmonies in NL and LN move from stability to a state of greater tension. Once again, while no one could make a credible claim that movement from tonic to subdominant is protectable by itself, the creative choice of this element is identical in both NL and LN (and the opposite in HG).

13. Intervals

These patterns are also reflected in the melodies. Intervals are measured by the distance between two pitches.[6] The different intervals chosen by a composer play an important role in the character of the melody. The melodies of these three songs comprise mostly step-wise motion (movement from a pitch to the next adjacent scale tone). Two leaps or larger intervals break up this stepwise movement on or near the end of each of the two phrases (marked in blue in HG and in red in NL and LN in example 4 below). The intervals outlined in the third measure of each phrase show an extreme contrast.[7] The perfect fifth (P5, A to D) outlined in HG is considered one of the most

---

[5] The plagal cadence is heard at the end of many Christian hymns on the syllables "a-men."
[6] "Interval" is defined as "the relationship between two pitches." *The Harvard Dictionary of Music* (Fourth Edition, 2003, Harvard University Press p. 413).
[7] I am discounting the quick G that the melody passes through in NL because of its brevity (a neighboring sixteenth note only about 12 milliseconds in duration) as opposed to the much

consonant intervals while the augmented fourth or tritone in NL and LN is one of the most dissonant.[8] These notes also help define the underlying harmony and, in NL and LN, the move from tonic to subdominant. The dissonant interval (the tritone marked as TT in the example) outlined in the third measure of NL and LN cries out for resolution. On the other hand, in HG, the descending perfect fifth (A to D passing through G) provides a sense of resolution.

Example 4. HG, NL, and LN Important intervals or "leaps"




14. The "three notes"

While Dr, Ferrara's report neglects to take into account the fundamental differences in modality (major and minor), the differences in harmonies (including function), and the distinctive intervals, he finds that three notes remain when all the pitches that are in HG or not in NL are eliminated. While I disagree with this methodology, as will be seen, these three notes are among the most important in these melodies. Example 5 below highlights each of these three notes.

---

longer A and Eb). With its dissonance, the tritone outlined by the outer notes in this measure dominates the aural experience of this measure rather than the extremely brief sixteenth note G (which has a duration of approximately only 0.125 seconds).

[8] The tritone, characterized as *diabolus in musica* ("the Devil in music"), was avoided during the Middle Ages. Film composers such as Bernard Herrmann have used the interval to great effect to create tension (for example, in Alfred Hitchcock's *Psycho*).

Example 5. HG, NL, and LN Important pitches




The first and third of these notes are the lowest notes in each of the three melodies. In HG these notes are highlighted in blue and are E and D respectively. In NL and LN the notes are D and Eb and highlighted in red. The two lowest notes in each of the three melodies are also the final notes of the two phrases in each song (except for the tossed off "oh" at the end of LN). Note that the overall melodic contour between the two phrases is descending (E to D) in HG and ascending in LN and NL. Moreover, the pitch E-flat is outside the key or non-diatonic to G major.

The second of the three notes, B natural in HG and Bb in NL and LN is also the highest note or peak in each melody. In the midst of the oscillating A's and G's which act like a melodic ceiling, these notes represent a momentary breakout to a higher pitch before returning to the repeated A and G. The Bb in NL and LN is also outside the key of G major and is the defining note of G minor. The Bb at the beginning of LN functions merely as a pick up, not a peak.

15. The World Is Not Enough

Dr. Ferrara's second example of similar prior art is a James Bond theme song from the eponymous 1999 film.

Example 6. WNE, NL, and LN Melodic comparison




While at least this example is in the minor mode (unlike HG), it is even less similar to NL and LN as they are to each other. It has only six pitches in common with LN and is missing the entire central syncopated pattern on the oscillating A's and G's. In general, it is more "square" rhythmically with figures set on the beat and completely lacking in syncopation. While WNE shares some harmonic and melodic similarities with NL and LN, there are important differences. The G minor chord (rendered in blue in example 6) contains a major 7 rather than a minor 7 (sometimes called the "spy chord" because of its association with spy thrillers[9]). And while the opening phrase and end of the second phrase are similar, the relatively sustained Bb (also colored in blue) which is the first note in the third complete measure of WNE is a chord tone (the seventh) rather than a chordal extension as the A is heard in NL (a 13th) and LN (a raised 11th). Overall, the melody in WNE acts very differently by never establishing the A as a melodic ceiling,

16. X-Men Theme

Like WNE, the X-Men theme cited by Dr. Ferrara does contain the pitches of the first phrase and the third measure of LN and NL, but the rhythms and phrase length are very different as can be seen in example 7 below. The overall pattern in X-Men is only two measures long (rather than three), the pick-ups are four sixteenth notes rather than three eighth notes, and the passage is missing the entire oscillating A's and G's at the heart of the passages from NL and LN.

[9] https://www.youtube.com/watch?v=rkFgW6Id2T4

Example 7. X-Men, NL and LN




Other than the detail regarding the three eighth-note pickups found in LN and the chorus of NL, in my preliminary report, Examples 4 and 6 were never intended to bolster the argument of substantial similarity. Rather they were mentioned as part of the quantitative and qualitative analysis of the expression at issue in the earlier song, NL. In sum, X-Men theme does nothing to undermine the originality of the overall expression in NL.

17. Echo

My report also discusses the echo of the antecedent phrase in both songs but makes no claim that the idea of using an echo is protectable in and of itself. In my opinion, the use of the echo on exactly the same musical expression has probative value and is, at the very least, indicative of copying. My analysis of the quantitative and qualitative value of the musical expression at issue in this case did not include the echo as an additional element.

18. Ferrara's methodology

Dr. Ferrara's lengthy report includes much material that is not relevant to the issues in this case. In the interest of saving the Court's valuable time I have focused on the most germane and important points. At times it seems that Dr. Ferrara is trying to bolster his case by overwhelming the reader with sheer volume. For example, detailed analysis of lyrics or sections of the songs not at issue serve no practical purpose. Much of the "prior art" is not similar enough for serious consideration. It is also unclear why he believes that detailed analysis of form or structure is an absolute requirement for analysis (particularly in a preliminary report). If a songwriter appropriates significant expression from the verse of another composer but places it the chorus of her own composition, does that excuse it? Does that make it different? In any event, except for his depiction of an approximately one second portion of NL as an intro, I mostly agree with Dr. Ferrara's description of form. His insistence on the necessity of structural analysis contradicts his procedure in the prior art analysis. If it is impossible to measure/evaluate similarity without analyzing the entire structure of a song, then all of Ferrara's comparisons of LN and NL with prior art are invalid since he never provides formal analysis of HG, "The World Is Not Enough," and X-men.

Perhaps most important, while pre-existing art and commonplace elements must be taken into account, filtering should not mean eliminating or erasing them from the analysis. The pitches that remain do not exist in a vacuum but as part of a coherent melody. Dr. Ferrara's reductionist methodology would render almost all creative expression unprotectable as fragmentary melodic segments could be used to subtract pitches from melodies and contextual elements such as harmonies would be erased as if they didn't affect the listener's perception of the melody. Juxtaposing two melodies with only a handful of pitches in common could introduce gaps and lacunae making the melodic expression incoherent, unintelligible, and unrecognizable.

That said, the filtering process is important, not only as a subtractive process or to recognize unprotectable elements, but also because it can help identify and illuminate any distinctive and creative elements in the expression at issue. Analyzing the remaining notes in isolation creates the false impression that they could exist apart from the melody in which they were found. Ontologically, these notes exist only as part of a larger melody. The central question is what is the importance of the remaining notes to the overall expression? Here the answer is clear.

Using this erasure procedure constructs a musical "straw man," reifies a collection of isolated pitches with no resemblance to the musical reality. Moreover, the passages of LN and NL at issue in this case are literally similar. While some of these melodic similarities can be found in HG, the alteration of key pitches that result in different modes (major and minor) and distinctive intervals along with the creative selection and arrangement of nearly identical supporting harmonies are unique to LN and NL.

Near the end of his rebuttal report, Dr. Ferrara argues "from a musicological perspective, the quantitative and qualitative analyses in the Stewart Report are moot" (paragraph 56). From a strictly musicological perspective this statement is ludicrous. Dr. Ferrara avoids discussing the significance of this expression and arrives at this opinion through his interpretation of legalistic technicalities. While he may want to dodge confirming it, no musicologist could credibly argue that the chorus and hook of LN or that the expression identified in NL are musically insignificant.

Dr. Ferrara's analysis fails because, after identifying the three notes, he neglects to consider their importance within the melodic expression at issue. Were these notes unimportant (for example, a brief passing tone[10] or one of a series of repeating notes) perhaps this surgical procedure could be justified. As my analysis has shown, these pitches are the most important in these melodies because they 1) define the mode (major or minor), 2) outline distinctive intervals (including a tritone) comprising the only larger intervals or "leaps" within the melodies, 3) are the lowest and highest notes of the melodies, and 4) are placed at the ends of the two phrases (the brief "oh" in LN notwithstanding).

---

[10] A "passing tone" is defined as a note "which connects two consonant pitches by stepwise motion and typically occurs in a metrically weak position." *The Harvard Dictionary of Music* (Fourth Edition, 2003, Harvard University Press p. 217).

19. Conclusions

I believe that the preponderance of the musicological evidence presented by the experts in this case points strongly toward copying. The literal similarity of the melodies in pitch sequence, melodic contour, intervals, phrasing, rhythms, and metric placement as well as the nearly identical selection and arrangement of harmonies and other elements amount to substantial similarities that in my opinion indicate copying. This expression is the most valuable content in both songs both from a quantitative and qualitative perspective. The material from “I Need To Love” forms the entire chorus or hook of “A Lonely Night.” – its most memorable part. The prior art cited by Dr. Ferrara is not nearly as similar to “I Need To Love” and “A Lonely Night” as “I Need To Love” and “A Lonely Night” are to each other.

Respectfully submitted,



Alexander Stewart, Ph.D. LLC

My CV is attached.

My rate is $325 per hour for research and analysis.

I have testified in the following cases in the past 4 years:

Testimony by Deposition (New York, NY, November 3, 2017) Supreme Court of the State of New York, Index No. 650427/2016. Pai v Blue Man Group Publishing, LLC, et al.

Testimony by Deposition (New York, NY, May 30, 2018) Griffin v. Sheeran. 1:17-cv-05221 New York Southern District Court

Testimony by Deposition (Burlington VT, January 2, 2020) Beatbox Music PTY, LTD, v. Labrador Entertainment, Inc. et al.

I have published the following articles in the past 10 years:

"Music, Media, and Anarchism in the 'Oaxaca Commune,'" In Oxford Handbook of Protest Music, edited by Noriko Manabe and Eric Drott, New York: Oxford University Press [forthcoming 2020].

"Been Caught Stealing": A Musicologist's Perspective on Unlicensed Sampling Disputes" University of Missouri Kansas City Law Review 83(2): 340-61 (Winter 2014).

"Make It Funky: Fela Kuti, James Brown and the Invention of Afrobeat." American Studies 52(4) (2013): 99-118.

"La chilena mexicana es peruana: Multiculturalism, Regionalism, and Transnational Musical Currents in the Hispanic Pacific." Latin American Music Review/Revista de Música Latinoamericana 34(1) (Spring 2013) Austin: University of Texas Press.

"'Funky Drummer': New Orleans, James Brown and the Rhythmic Transformation of American Popular Music." Reprinted in Roots Music, edited by Mark F. DeWitt. London: Ashgate, 2011 (originally published in Popular Music 19(3) October 2000 Cambridge University Press).

# *Alexander Stewart*

Department of Music and Dance
University of Vermont
Burlington, VT 05405

E-mail: astewart@uvm.edu
Office: (802) 656-7766
Mobile: (802) 310-2009

## EDUCATION

GRADUATE CENTER: THE CITY UNIVERSITY OF NEW YORK
Ph.D. in Music (Ethnomusicology Concentration), 2000
Dissertation: *Composition and Performance in Contemporary New York City Big Bands (1989-1999)* Advisor: Stephen Blum

MANHATTAN SCHOOL OF MUSIC
Master of Music, Jazz and Commercial, 1991

LONG ISLAND UNIVERSITY, C.W. POST
B.F.A., *summa cum laude,* in Music Education, 1988

## TEACHING EXPERIENCE

UNIVERSITY OF VERMONT
Professor, 2012-present
Associate Professor, 2005-2012
Assistant Professor, 1999-2005
Jazz Studies Coordinator, 2003-present
Director, Integrated Fine Arts Program, 2008-2012
Director, Latin American Studies Program, Spring 2006; 2011-16

LONG ISLAND UNIVERSITY, C.W. POST
Instructor in Music, 1988-1999
Director of Jazz Studies

Additional courses at:
The New School (Jazz and American Culture), 1995-1997
John Jay College of CUNY (History of Jazz and Rock), 1995

## COURSES TAUGHT

Jazz History
Jazz Improvisation I & II
World Music Cultures
Seminar in Ethnomusicology

Music Business & Copyright
Music Theory
Musical Avant-Gardes
Music of Cuba, Puerto Rico, and the Dominican Republic
Duke Ellington
Jazz Ensembles (Big Band and Combos)
Seminar in World Music (Honors College)
Music of Latin America and the Caribbean
Latin Jazz Summer Immersion
Culture and Politics of Latin American Protest Music (team taught with professors from Political Science, Romance Languages, and Global Studies)

## PUBLICATIONS

### *Books*

*Making the Scene: Contemporary New York City Big Band Jazz,* Berkeley: University of California Press, 2007.

Spanish translation from the French and German: Hans Bodenmann, *El ABC de la Flauta Dulce*. Zurich: Anton Peterer Music & Books, 2003 (Recorder method book).

### *Forthcoming*

"Music, Media, and Anarchism in the 'Oaxaca Commune,'" In *Oxford Handbook of Protest Music,* edited by Noriko Manabe and Eric Drott, New York: Oxford University Press [2020].

### *Articles, Book Chapters, Reviews, Entries*

"Been Caught Stealing": A Musicologist's Perspective on Unlicensed Sampling Disputes" *University of Missouri Kansas City Law Review* 83(2): 340-61 (Winter 2014).

"Make It Funky: Fela Kuti, James Brown and the Invention of Afrobeat." *American Studies* 52(4) (2013): 99-118.

"*La chilena mexicana es peruana*: Multiculturalism, Regionalism, and Transnational Musical Currents in the Hispanic Pacific." *Latin American Music Review/Revista de Música Latinoamericana* 34(1) (Spring 2013) Austin: University of Texas Press.

"'Funky Drummer': New Orleans, James Brown and the Rhythmic Transformation of American Popular Music." Reprinted in *Roots Music,* edited by Mark F. DeWitt. London: Ashgate, 2011 (originally published in *Popular Music* 19(3) October 2000 Cambridge University Press).

Review of Ben Ratliff, *Coltrane: The Story of a Sound*. *Jazz Perspectives* 2(1):103-109 (2008).

"Contemporary New York City Big Bands: Composition, Arranging, and Individuality in Orchestral Jazz," *Ethnomusicology* 48(2) (Spring/Summer 2004): 169-202.

Review of *The New Grove Dictionary of Jazz* in *Ethnomusicology* 47(3) (Fall 2003):376-80.

"Second Line," *Encyclopedia of Popular Music of the World*. London: Cassell 2003.

Essay review of Lewis Porter, *John Coltrane: His Life and Music*. *Annual Review of Jazz Studies 11*, 2000-1 [2002]: 237-52.

"'Funky Drummer': New Orleans, James Brown and the Rhythmic Transformation of American Popular Music," *Popular Music* 19(3) (Winter 2000): 293-318.

Review of Scott DeVeaux, *The Birth of Bebop*. *Yearbook of Traditional Music* 30 (1998): 135-7.

## LECTURES, COLLOQUIA, CONFERENCE PAPERS

"The Future of Copyright Infringement Analysis in Music." Silicon Flatirons Conference. Colorado Law, University of Colorado, Boulder. Invited speaker/panelist. March 5, 2020.

"Blurred Lines III: Legal Considerations When Writing." Canadian Film Centre Slaight Music Residency Panel Talk. Toronto, Canada. August 7, 2019

"Blurred Lines II: Legal Considerations When Writing." Canadian Film Centre Slaight Music Residency Panel Talk. Toronto, Canada. August 13, 2018

"The Future of Sampling: Transformative Art or Copyright Infringement?" Alexander von Humboldt Institute for Internet and Society, Berlin, Germany. February 28, 2018.

"Blurred Lines: Legal Considerations When Writing." Canadian Film Centre Slaight Music Residency Panel Talk. Toronto, Canada. August 2, 2017

"Creativity and Copyright," Champlain College, November 11, 2015

Invited Keynote Speaker: Symposium on Hip Hop, Technology, and Copyright. Utah State University. (March 28, 2015).

"Make It Funky: Fela Kuti, James Brown and the Invention of Afrobeat." Annual Conference of the American Studies Association. Washington DC, November 23, 2013.

"Creativity and Copyright," Champlain College, October 25, 2013

"Lila Downs: Music, Culture, and Politics in Oaxaca, Mexico." Pre-Concert Lecture. Flynn Center for the Performing Arts. Burlington, VT. April 26, 2013.

"Music, Media, and Anarchism in the Oaxaca Commune" Paper presented at Music and War Panel. AMS/SEM/SMT Annual Conference. New Orleans. Nov. 2, 2012.

"*Pasos cromáticos en la improvisación del jazz* (Chromatic Passing Tones in Jazz Improvisation)." Lecture/workshop (in Spanish) at Instituto Projazz, Santiago, Chile. May 31, 2012.

"Musicology CSI: Sampling, Interpolation, and Copyright." Thursdays at One Performance/Lecture Series, UVM Music Department.

"Music, Media, and Anarchism in the 'Oaxaca Commune,'" Presentation to University of Vermont Global Village, 15 February 2011.

"*Son de las barricadas*: Protest song and revolution on Oaxaca's Radio APPO." Paper read at the annual conference of Society for Ethnomusicology (SEM) in Los Angeles, CA, Nov. 2010.

"*Son mexicano*" OLLI (Osher Life Long Learning Institute). Pre-Concert Lecture Sones de México, Lane Series 8 October 2010.

"*Música popular* and the Ideology of *mestizaje* in Postrevolutionary Mexico." 1 October 2010, UVM Hispanic Forum.

Musicology CSI: Sampling, Interpolation, and Copyright." Invited lecture, State University of New York (SUNY) Albany, 28 April 2010.

"La Chilena Mexicana: Transnational Musical Currents in the Hispanic Pacific" Global and Regional Studies Lecture, 17 March 2010 Billings Marsh Lounge.

"Copyrights and Copywrongs: Introduction to Forensic Musicology" Invited lecture, State University of New York (SUNY) Plattsburgh, 11 March 2010.

FLYNNsights: Lecture on Charles Mingus opening the residency of the Mingus Repertory Ensembles (Mingus Dynasty, Mingus Orchestra, and Mingus Big Band along with dance troupe choreographed by Danny Buraczeski at the Flynn Center for the Performing Arts. 17 October 2010.

"Supergenre, genre, subgenre: Mexican *son* and the *chilena* complex." Paper presented at the annual conference of the Society for Ethnomusicology (SEM) in Mexico City, November 2009.

"*Socialismo con pachanga*: Music in Revolutionary Cuba." Hispanic Forum, University of Vermont, 22 October 2009.

"Performing Race: Afro-Mexicans and Multiculturalism in Oaxaca's Guelaguetza." Paper presented at the Latin American Studies Association (LASA) XXVIII International Congress, "Rethinking Inequalities" Rio de Janeiro, Brazil, 12 June 2009.

*La chilena oaxaqueña: "El gusto de mi region*." Paper presented at the annual conference of the Sonneck Society for American Music (SAM), Denver, CO, 19-22 March 2009.

Insights FlynnArts. Pre-concert lecture on Maria Schneider and her Orchestra. 22 January 2009. Amy E. Tarrant Gallery at the Flynn Center for the Performing Arts.

"Performing Race: Afro-Mexicans and Multiculturalism in Oaxaca's Guelaguetza Festival." Paper presented at the annual meeting of the Society for Ethnomusicology (SEM), Wesleyan University, Middletown, CT, 28 October 2008.

"*La Danza de las Diablas*"? Race, Gender, and Local Identity in Afro-mestizo communities of Mexico's Costa Chica. Paper presented at the annual meeting of the Society for Ethnomusicology (SEM), Columbus, OH, 28 October 2007.

"*Son de las Barricadas*": Songs of Protest from the Spanish Civil War to the Present on Oaxaca's Radio APPO." Hispanic Forum, University of Vermont, 10 October 2007.

"Cross-Cultural Learning through Music and Dance: A UVM Class in Guantánamo, Cuba." Presentation to the UVM College of Arts and Sciences Advisory Board, April 2004.

"Beauty and the Beast: Maria Schneider's *Wyrgly*." Paper presented at special session of the joint meetings of Society for Music Theory (SMT) and the American Musicological Society (AMS), "Women in Jazz: Voices and Roles," Columbus, OH, 1 November 2002.

"On the Edge: Sue Mingus and the Mingus Big Band." Colloquium at the University of Illinois (Urbana and Champaign), 6 March 2002.

"*Blood on the Fields:* Wynton Marsalis and the Transformation of the Lincoln Center Jazz Orchestra." Paper read at the 2001 annual meeting of the Society for Ethnomusicology (SEM), Detroit, October 2001.

"The Jazz Concerto as Collaborative Work: Jim McNeely's 'Sticks.'" Paper read at the joint meeting of the Society for Music Theory (SMT) and other major music societies in Toronto, 4 November 2000.

"New York City Big Bands and the Professional Jazz Musician." Paper read at the annual meeting of the Society for Ethnomusicology (SEM) in Bloomington, IN, 24 October 1998.

"From Mardi Gras to Funk: Professor Longhair, James Brown and the Transformation of Rhythm and Blues." Paper read at joint meeting of the Society for Ethnomusicology (SEM) and the International Association for the Study of Popular Music (IASPM) in Pittsburgh, PA, October 1997.

## GRANTS AND AWARDS

UVM Humanities Center Public Humanities Fellowship for sabbatical travel to Uganda. 2019.

International Travel Funds Award. College of Arts and Sciences. Travel to and residency in Uganda. Jazz Performance and Workshops; Research in Traditional Music. October and November 2019.

Interdisciplinary Experiential Engagement Award for course proposal, *Culture and Politics of Latin American Protest Music*, to be taught in collaboration with Political Science, Romance Languages, Global Studies, and Music Departments. January 2013.

Lattie F. Coor Award for International Travel to present paper and chair panel at the Society for Ethnomusicology conference (SEM) Mexico City. November 2009.

Joan Smith Faculty Research Support Award *Performing Race: Afro-Mexicans, Multiculturalism, and the "Black Pacific."*

Lattie F. Coor Award for International Travel to present paper at the Latin American Studies Association (LASA) Congress in Rio de Janeiro, Brazil. June 2009.

Fulbright Research Fellowship to Mexico, Afro-Mexican music, 2006-7.

Award for Contribution to Vermont Jazz Education, presented by Wynton Marsalis and the Flynn Center for the Performing Arts, October 2005.

UVM Arts and Sciences Dean's Fund for Faculty Development (to initiate fieldwork in the Costa Chica of Mexico), Fall 2005.

UVM Humanities Center Research Grant, Spring 2004.

UVM Global Outreach Committee Grant, March 2003.

UVM Arts and Sciences Faculty Development Grant for study in Cuba, May 2002.

2001 Barry S. Brook Award for best dissertation in music CUNY.

CUNY Dissertation Year Fellowship 1998-1999.

## MUSIC COPYRIGHT & RELATED

Expert Report in Bridgeport Music, Inc. v. Dimension Films, 410 F.3d 792 (6th Cir. 2005). Case recognized as setting new "bright line" standard for use of samples of copyrighted recordings.

Testimony in trial in Federal District Court, Nashville TN, Case No. 3:01-780, Bridgeport Music v. Universal Music. February 2007. "Atomic Dog" and "D.O.G. in Me." Affirmed by US Sixth Circuit Court of Appeals, No. 07-5596, November 4 2009. Case examined issues concerning fragmented literal similarity, originality, and fair use.

Testimony in Federal District Court, Nashville, TN Case No. 3:01-0155 involving rap artist, the Notorious B.I.G and the Ohio Players. (March 2006). Affirmed by US Sixth Circuit Court of Appeals, No. 06-6294, October 17 2007.

Testimony by Deposition (for the Plaintiff), Case No. 1:09-cv-21597-DLG (Florida Southern District Court) Kernel Records Oy v. Timothy Z. Mosley p/k/a Timbaland, UMG Recordings, Inc, et al. New York City, May 27, 2010.

Testimony by Deposition, Case No. 37-2008-00098508-CU-BT CTL (California Southern District Court) Sixuvus v. Victor Willis, New York City, July 7, 2010.

Testimony by Deposition (Los Angeles, September 2011). Case No. 10-CV-08123 Phoenix Phenom v. William Adams, Jr. Stacy Ferguson, et. al.

Testimony by Deposition (New York City, January 2012). Case No. SACV10-1656JST(RZx) Pringle v. William Adams, Jr. Stacy Ferguson, et. al.

Testimony by Deposition (New York City, June 3, 21, 2013). Case No. CV12-5967 VMG Salsoul, LLC v. Madonna Ciccone, Shep Pettibone, et al.

Testimony by Deposition (New York City, September 11, 2013). 11-cv-6811. Marino v. Usher.

Testimony by Deposition (Burlington, VT, May 20, 2015). RALEIGH, NC #301280 Absent Element v. Daughtry.

Testimony by Deposition (Burlington, VT, May 17, 2016) and in Trial (June 17, 2016) Federal District Court, Los Angeles Case No. 15-cv-03462 RGK (AGRx). Skidmore v. Led Zeppelin, et al.

Testimony by Deposition (New York, NY, November 3, 2017) Supreme Court of the State of New York, Index No. 650427/2016. Pai v Blue Man Group Publishing, LLC, et al.

Testimony by Deposition (New York, NY, May 30, 2018) Griffin v. Sheeran. 1:17-cv-05221 New York Southern District Court

Testimony by Deposition (Burlington VT, January 2, 2020) Beatbox Music PTY, LTD, v. Labrador Entertainment, Inc. et al.

**Los Angeles**: Warner Bros. Entertainment Inc.; Hiscox Insurance Co.; Clair G. Burrill P.C.; Sheppard Mullin Richter & Hampton LLP; Doniger Burroughs, APC; Pen Music Group; Microhits; Robert S. Besser Law Offices; etc.

**New York**: BMG Group; Schwartz Ponterio & Levenson, PLLC; Grubman Shire & Meiselas, P.C.; Eisenberg Tanchum & Levy; Sample Clearance Limited; Lastrada Entertainment Company; etc.

**Nashville**: King and Ballow; Riser House Entertainment, LLC; DeSalvo Law Firm, PLLC; Beckett Law Office; etc.

**Elsewhere**: K & L Gates (London); Schwartz Cooper (Chicago); Brooks Pierce (Raleigh NC); Frank & Rice (Florida); Francis Alexander, LLC (Philadelphia); Rawson Merrigan & Litner (Boston); Koepple Traylor (New Orleans); JPMC (Burlington VT); Kile Goekjian McManus (Washington DC); Arent Fox LLP (Washington DC) Gould Law Group (Chicago); Richardson Patrick Westbrook & Brickman, LLC (Mt Pleasant SC); Hall Booth Smith & Slover (Atlanta); Miller Canfield Paddock & Stone (Detroit); King Mesdag Music Publishing Limited (United

Kingdom); as well as clients in Canada, Australia, Indonesia, Hong Kong, India, United Arab Emirates, Latin America and Europe.

Classes and seminars in Music Business and Copyright (see above for details)

Symposium on Music Copyright. University of Vermont, January 2003.

## SELECTED RECORDINGS

*Early Heroes, Dan Silverman*. Section playing and solo on Chares Mingus' *The Shoes of the Fisherman's Wife*…Around the Slide Recordings 02 (2018).

Rick Davies *Thugtet* – Tenor saxophone Emlyn Music EM 1003 (2017)

Rick Davies and Jazzismo, *Salsa Norteña*, - Tenor saxophone (Recorded in Montreal 2011 (2012).

New York Jazz Repertory Orchestra, *Le Jazz Hot*, featuring Dave Liebman and Vic Juris. Planet Arts 310976 - Baritone saxophone, bass clarinet (2009).

Rick Davies and Jazzismo, *Siempre Salsa*, featuring Wayne Gorbea. Emlyn Music EM1001 - Tenor saxophone (2006).

Anne Hampton Callaway, *To Ella with Love,* featuring Wynton Marsalis, Christian McBride, Lewis Nash, Cyrus Chestnut. Touchwood Records TWCD 2006 - Tenor saxophone and clarinet (1998).

Peter Herborn, *Large*, featuring Gene Jackson, Greg Osby, Robin Eubanks, and others. Jazzline JL1154-2 – Baritone saxophone and bass clarinet (1998).

Billy Stritch, *Waters of March: The Brazilian Album*. Sin Drome SD8950 - Tenor saxophone and flute (1998).

Dave Stryker, *Nomad*, featuring Randy Brecker and Steve Slagle. Steeplechase Records SCCD31371 - Baritone saxophone and bass clarinet (1997).

Frankie Lane: *Wheels of a Dream*. Touchwood Records TWCD 2020 - Tenor saxophone, flute, and alto flute (1997).

The Bill Warfield Band, *The City Never Sleeps*. Seabreeze Records CDSB 2048 - Baritone saxophone and bass clarinet (1996).

## SELECTED PERFORMANCES: JAZZ AND LATIN

***Burlington Discover Jazz Festival Big Band*** (Music Director, Contractor, Performer)

*Birth of the Cool: Music by the Miles Davis Nonet*. Featuring Ray Vega, trumpet. Performances in June 2012 (BDJF), and in September 2012 (UVM), and May 2013 (SUNY Plattsburgh).

*Textures: Jim Hall with Brass featuring the Jim Hall Trio (Jim* Hall, guitar, Scott Colley, bass and Joey Baron, drums) with brass ensemble, Alex Stewart, conductor. Flynn MainStage, 2010 Burlington Discover Jazz Festival.

*Paquito D'Rivera Funk Tango*. Produced, co-directed, and played saxophone in concert on Flynn MainStage with 17-piece orchestra with guests: Paquito D'Rivera, alto saxophone; Diego Urcola, trumpet; Alex Brown, piano; Massimo Biocalti, bass; Mark Walker, drums; and special guest Ray Vega, trumpet. Burlington Discover Jazz Festival (1 June 2008). Reviews in *Free Press*, AllAboutJazz, and other media.

*Mary Lou Williams Resurgence* with Cecilia Smith, vibraphone and Amina Claudine, piano, 2007 Burlington Discover Jazz Festival, Flynn Center.

*Music of Jim McNeely* with special guest Jim McNeely, piano 2006 Burlington Discover Jazz Festival, Flynn Center.

*Sketches of Spain: Celebrating the Miles Davis/Gil Evans Collaboration* with trumpeter Randy Brecker and guest conductor, Joe Muccioli 2005 Burlington Discover Jazz Festival, Flynn Center.

*The Grand Wazoo: Music of Frank Zappa*, with Ernie Watts, Napoleon Murphy Brock, Ike Willis, and Ed Palermo 2004 Burlington Discover Jazz Festival, Flynn Center.

*Duke Ellington Sacred Concert*, with David Berger, Priscilla Baskerville, Paul Broadnax, and 100-voice Choir, 2003 Burlington Discover Jazz Festival, Flynn Center

***Jazz and Latin***

Solo Recital: Chasin' the 'Trane: Music of John Coltrane. UVM Southwick Recital Hall, September 27, 2018.

Concert: Ray Vega & the Burlington Latin Jazz Orchestra, FlynnSpace, August 9, 2018.

Recital: Ray Vega & the Burlington Latin Jazz Orchestra, UVM Southwick Recital Hall, October 21, 2018.

Chasin' the Trane: Homage to John Coltrane, with Ray Vega, trumpet. Juniper, Hotel Vermont, 2018 Burlington Discover Jazz Festival June 7 and July 18, 2018.

Chasin' the Trane: Homage to John Coltrane, with Ray Vega, trumpet. Light Club Lamp Shop, Burlington VT, July 26, 2018

Performances of Alex Stewart Quartet on Jazz Wednesdays at Juniper (Hotel Vermont), Lamp Shop Light Club (some performances featured special guest Ray Vega, trumpet), 2018.

Featured soloist – SUNY Plattsburgh Jazz Festival December 2013.

James Harvey and Garuda – opening act for Randy Weston in Discover Jazz Festival (2004); numerous other performances around region.

Beboparaka (featuring poetry of Amiri Baraka) andJazzLit.com – jazz and poetry collaborations with UVM professors Major Jackson, Tina Escaja, John Gennari and UVM students. Performances at the Discover Jazz Festival and local venues. Coverage in the *Burlington Free Press* and *Vermont Quarterly* (2005, 2006).

Grupo Sabor (Salsa and Merengue) – Performances in UVM's Grand Maple Ballroom and Brennan's Pub for Alianza Latina (2010), Higher Ground, Burlington; Red Square; Eclipse Theater, Waitsfield; Onteora Club, New York; Burlington Latino Festival (2001-present).

Performances with UVM jazz faculty (Jeff Salisbury, Joe Capps, Paul Asbell, Patricia Julien, Ray Vega, John Rivers, Tom Cleary, Rick Davies, Steve Ferraris) at recitals, concerts, and other events (1999-present).

The Lionel Hampton Orchestra; featured artists: Dizzy Gillespie, Dee Dee Bridgewater, and others. Extensive tours of Europe and North America and appearances at major jazz festivals including: North Sea, Nice, Montreal, Newport (NY and Saratoga), Biarritz (1989-1991).
The Bill Warfield Band, The Dorsey Brothers Orchestra, David Berger, Paquito D'Rivera, Clem DeRosa, Bobby Shew, David Liebman, Andy Farber, Stan Rubin, Lew Anderson, Billy Mitchell, Roland Hanna, Lew Soloff, Randy Brecker and many more (1985-1999).

The Lehigh Valley Repertory Jazz Orchestra: *Sketches of Spain* featuring Randy Brecker, *An Evening with David Liebman*, *A Tribute to Benny Goodman* featuring Buddy DeFranco, and *Celebrating Louis Armstrong* featuring Jon Faddis (1997-2000).

***Rick Davies & Jazzismo***

Burlington Latin Jazz Orchestra, directed by Ray Vega, FlynnSpace, August 9, 2018

Featured Performer: Jazz Education Network Conference, San Diego, CA January 2015.

Workshops and concerts, Colectivo Central, Oaxaca, Mexico. June, July 2011.

With guest pianist/composer Arturo O'Farrill (and sons, Zachary, percussion and Adam, trumpet), FlynnSpace. 2010, 2011, 2012, 2013, 2014, 2015, 2017, 2017. With Jonathan Maldonado, drums, and Papo Ross, vocals and alto saxophone, 2009.

With guest artist Ray Vega, FlynnSpace (July 2003, 2004, 2005, 2006, 2007, 2008).

Appearances at SUNY Plattsburgh Jazz Festival (with Harvie S., 2002; with Chocolate Armenteros 2003; with Ray Vega 2008, 2011; with Curtis Fowlkes 2010 ); Red Square and other venues.

Oaxaca, Mexico: Colegio Teizcali, Colectivo Central, Spring 2007.

## SELECTED PERFORMANCES: POPULAR AND BLUES

Frankie Valli, Ray Charles (Sweden 1999), Mary Wells, Frankie Avalon (Atlantic City), The Drifters, Funk Filharmonik, The Funk Collection, Nick Apollo Forte, Little Wilson, Sandra Wright Band, Jimmy Branca and the Red Hot Instant Combo, Dave Grippo Funk Band, and others (1985-present).

Contractor, musical director. *Joan Rivers*. Flynn Center for the Performing Arts. April 26, 2012.

Orchestra contractor with Bernadette Peters at the Flynn Center of the Arts October 2011.

## CLINICS AND GUEST CONDUCTING

Guest Conductor, Connecticut Valley District Jazz Festival, January 30-31, 2015.

Guest Conductor, Winooski Valley Jazz Festival, February 4-5, 2010.

Adjudicator/Clinician, Vermont All-State Festival, International Association of Jazz Educators (IAJE): 2000-2003.

Guest Conductor, Nassau County (Long Island) All-County Jazz Festival, 1997.

## MEMBERSHIPS

American Musicological Society (AMS)

Society for Ethnomusicology (SEM)

Society for American Music (Sonneck)

Latin American Studies Association (LASA)

Friends of Indian Music and Dance (FIMD), Burlington VT

Burlington Discover Jazz Festival Advisory Board